CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 0 1 2005

JOHN F. CORCORAN, CLERK
BY:
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **BRUNSON/ROSS COMMUNICATIONS, LLC** ) | |
| ) | |
| **Plaintiff,** ) | Civil Action No. 7:04-CV00026 |
| ) | |
| v. ) **By:** | Hon. Michael F. Urbanski |
| ) | United States Magistrate Judge |
| **BIP, INC.** ) | |
| **and** ) | |
| **JAMES R. PRIDEMORE** ) | |
| ) | |
| **Defendants.** ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case, involving a claim for attorneys' fees and repair costs to a television transmitter, was tried to the court on July 26, 2005. Upon consideration of the evidence presented and post-trial memoranda, the Court makes the following findings of fact and conclusions of law.

### I

### FINDINGS OF FACT

The following facts are found by the greater weight of the evidence.

(1) Plaintiff Brunson/Ross Communications, LLC ("Brunson/Ross") entered into an Asset Purchase Agreement on April 30, 1999, with defendants BIP, Inc. ("BIP"), James R. Pridemore ("Pridemore") and Melvin N. Eleazer ("Eleazer"), for the purchase of the television translator station W54BT, Roanoke, Virginia.

(2) The Asset Purchase Agreement concerned, *inter alia*, all tangible personal property owned by BIP, the seller, and used by it in the operation of the station. The Asset Purchase Agreement provided that the tangible personal property, "is now and on the Closing Date will be

in good operating condition and repair, reasonable wear and tear in ordinary usage excepted; is adequate, fit and suitable for the particular purposes for which it is presently used; is performing satisfactorily; and is available for immediate use in the conduct of the business and operations of the Station. All such Tangible Personal Property and the state of maintenance thereof is, and on the Closing Date will be, in compliance in all material respects with the rules and regulations of the FCC and with all other federal, state and local applicable statutes, ordinances, rules and regulations." (Asset Purchase Agreement at 6)

(3) The Asset Purchase Agreement provides that "[e]ach party shall be responsible for its own legal expenses associated with this Agreement. . . ." (Asset Purchase Agreement at 4) In the case of default by the Seller, the Asset Purchase Agreement provides "[I]n any action brought by Buyer to enforce this Agreement where Buyer prevails, Buyer shall be entitled to be reimbursed by Seller for reasonable attorney's fees and costs incurred in or as a result of such action." (Asset Purchase Agreement at 11)

(4) Following Federal Communications Commission ("FCC") approval, several attempts were made to close the transaction to no avail.

(5) After such efforts failed, Brunson/Ross filed suit on January 13, 2004 against BIP and Pridemore for specific performance of the contract.

(6) At a pretrial conference on August 13, 2004, the parties announced they had agreed to resolve their differences and perform the Asset Purchase Agreement. Negotiations between counsel on various issues, including a tower lease, ensued and closing was set for April 15, 2004.

(7) On April 6, 2005, Dorothy Brunson ("Brunson"), President of Brunson/Ross, met with Melvin Eleazer ("Eleazer"), BPI's manager, at the physical location of the translator

2

station's equipment on Poor Mountain. At this time, Brunson noted a transmitter was unplugged from its power source, was producing only faint, blurry color bars on the television screen and there were broken pieces of the antenna and equipment lying nearby. As a result, Brunson decided to have the transmitter tested for any defects by an expert before finalizing the agreement. The transmitter was not utilized or connected to a power source after this date.

(8) On April 15, 2005, the parties closed on the transaction, subject to an Escrow Agreement reserving $46,000 to cover the cost of repairs to the transmitter and for attorneys' fees. The Escrow Agreement reserved funds from closing relating to the "maximum anticipated cost of correcting the problem(s)" with the transmitter conveyed as part of the sale. (Escrow Agreement at 2) The Escrow Agreement also provided that "the defendants in Case No. 7:04CV00026 have agreed that they are obligated to pay some amount to Buyer for its attorneys fees in the case, and that the sole issue of disagreement between the parties is the amount of the fees to be paid." (Id.) The Escrow Agreement provided that the parties will attempt to reach agreement on the amount of fees due, "but if agreement is not reached, the parties will submit to the Court the sole issue of the amount of fees to be paid to Buyer." (Id.) The Escrow Agreement contained no provision for recovery of attorneys' fees.

(9) Plaintiff hired S. J. Ramer Associates, Inc. to test and repair the transmitter as needed. Steve Ramer, its principal, has thirty-five years of experience in the electronics industry and fifteen years of experience with broadcast equipment. Ramer performed field service and system tests and repairs for Acrodyne, the manufacturer of the transmitter at issue, for eight years. He currently operates his own business repairing transmitters and is a contractor hired by Acrodyne to repair transmitters they manufacture. Ramer estimated he has completed over one thousand

3

hours of field repair of the specific transmitter model purchased by the plaintiff in the last ten years. Based on his substantial experience and knowledge, Ramer was qualified as an expert on the operation, repair and maintenance of the transmitter at issue.

(10) Ramer inspected the transmitter at the Poor Mountain site on May 17, 2005, in the presence of Eleazer. Ramer was unable to perform testing of the transmitter and its components there because the transmitter was disconnected and there was no electrical power to allow him to do so.

(11) Ramer removed all cables and modules from the transmitter with the exception of two power supplies. He then transported them to his Warminster, Pennsylvania workshop for testing.

(12) After testing all removed equipment, Ramer determined the two power amplifiers, reject load assembly, output coupler and eight of twenty transistors with some attached circuitry were defective. Ramer replaced those components and found all other components were suitable for usage and showed evidence of only normal wear and tear.

(13) Ramer testified that the transmitter purchased by plaintiff would be unable to run at one hundred percent capacity, and would instead only be able to run at between thirty and fifty percent capacity. This would be sufficient for the transmitter to pick up a small signal, but would be insufficient to meet FCC standards.

(14) Ramer estimated that it took eight hours of labor to test all components that were determined to be functioning and did not need replacement. His rate for labor is $145.00 per hour.

4

(15) Ramer also determined that it will take one additional workday to complete this project by reassembling the transmitter on site and restoring it to good working condition. Ramer attempted to complete this work on July 25, 2005, but was denied access by Eleazar. Ramer's rate for completion of this project is $700 per day, and that the installation would require three days, including travel to and from Pennsylvania.

(16) Kevin P. Oddo, litigation counsel for plaintiff Brunson/Ross with the law firm of LeClair Ryan Flippin Densmore ("LeClair Ryan"), served in that capacity from November 20, 2003 through the present. LeClair Ryan incurred attorneys' fees and expenses of $17,774.52 covering the period up to August 13, 2004, and $2,805.93 after that period. (Stipulation ¶¶ 7-9.) These fees included work to prepare for and file the instant lawsuit, prosecution of the suit and, after August 13, 2004, certain work related to the transmitter tower lease and the closing of the Asset Purchase Agreement. Plaintiffs requested additional fees for trial. The parties stipulated that the hourly rate and amount of time incurred by LeClair, Ryan are reasonable, (Stipulation ¶ 10), but defendant disagreed that plaintiff was entitled to any fees prior to the filing of the suit or after the announcement that the parties would perform on August 13, 2004.

(17) Barry D. Wood, of Wood, Maines & Brown, of Washington, D.C., served as counsel for Dorothy Brunson for twenty five years and assisted her in the creation of Brunson/Ross for the purposes of the Asset Purchase Agreement transaction. Wood specializes in communications law and FCC transactions. Wood hired Oddo to serve as trial counsel for the purposes of the present litigation. Wood and Oddo collaborated on matters related to this litigation, including after August 13, 2004, matters related to the transmitter tower lease involving BIP and the closing of the Asset Purchase Agreement. Wood, Maines & Brown incurred attorneys' fees and

5

Case 7:04-cv-00026-mfu Document 26 Filed 09/01/05 Page 5 of 11 Pageid#: 176

expenses of $9,921.11 for the period prior to August 13, 2004, and $1,737.42 after that period. (Stipulation ¶¶ 11-13.) In addition to serving as second chair counsel at trial, Wood testified as a witness in this case.

## **CONCLUSIONS OF LAW**

(1) Plaintiff is entitled to receive the costs of testing, repairing and reassembling the transmitter under the terms of the Asset Purchase Agreement. The Asset Purchase Agreement provides the tangible personal property will be in good operating condition and repair, excepting only reasonable wear and tear. The evidence established that the transmitter located on Poor Mountain was not in good operating condition or fit for the purposes for which it is normally used when it was inspected or tested by Ramer on May 17, 2005. The transmitter was clearly unable to function at normal capacity based on the numerous defective components removed, tested and repaired by Ramer.

(2) Defendant argued that there was no evidence that the transmitter was defective at closing since Ramer's examination did not take place for another month. Defendant's argument is unavailing, however. Since there was no other usage of or power supplied to the transmitter after April 6, 2005 when Brunson and Eleazer visited and inspected the transmitter, the inescapable conclusion is that the transmitter was not in good operating condition or fit for the normal purposes of its intended use on the date of closing, April 15, 2005. Simply put, there was no evidence that the transmitter was in good operating condition or fit for normal usage or, for that matter, had been connected to a power source at any time between April 6, 2005 and the date of Ramer's inspection.

(3) As such, plaintiff is entitled to recover the cost of testing and repairs of the defective components of the transmitter. It is the conclusion of Court that the rates submitted by Ramer as an expert in the repair of such transmitter devices are reasonable, as is the amount of time expended to test and repair those components, which total $10,850.56. However, the Court deducts eight hours of labor at the rate of $145.00 per hour for the expense estimated by Ramer in the testing and evaluation of parts determined not to be defective in the transmitter. The Court will award $2,100.00 for the cost of one day's labor (plus two days travel) to reassemble the components of the transmitter at the Poor Mountain location. Therefore, total award for breach of the warranty provision costs to the plaintiff is $11,790.56.

(4) The attorneys' fee provision in the remedies section of the Asset Purchase Agreement allows plaintiff, should it prevail, to recover "reasonable attorneys' fees and costs incurred in or as a result of such action." (Asset Purchase Agreement at 11) A threshold question exists, therefore, as to whether plaintiff prevailed in this action. Plaintiff brought suit for specific performance of the Asset Purchase Agreement, and through its efforts the deal closed on April 15, 2005. Further, both in the Escrow Agreement and the Stipulation, BIP conceded that it was responsible to pay some attorneys' fees, but disputed the magnitude of the fees claimed by plaintiff. Thus, based on the fact that the agreement closed following institution of the specific performance action and BIP's admission that it owed some attorneys' fees, it is clear that plaintiff prevailed in this action. As a result, plaintiff is entitled to the recovery of reasonable attorneys' fees and costs incurred in the present litigation.

(5) The Fourth Circuit has adopted the "lodestar" calculation to determine reasonable attorneys' fees. Hilt v. Hurd, 2001 U.S. Dist. LEXIS 19506, at *2 (W.D. Va. Nov. 21, 2001).

The lodestar method calculates attorneys' fees by, "multiplying the number of reasonable hours expended times a reasonable rate." Id. at 3, quoting Brodziak v. Runyon 145 F.3d 194, 196 (4th Cir. 1998). The Fourth Circuit uses twelve factors to determine whether the applicable rate and hours qualify as "reasonable." These factors are as follows: (1) the time and labor expended to litigate the suit, (2) the novelty and difficulty of the questions raised, (3) the skill required to perform the legal services required properly, (4) the attorney's opportunity costs in pressing the litigation, (5) the customary fee for like services, (6) the attorney's expectations at the outset of litigation (fixed or contingent fee), (7) time limitations imposed by the circumstances or client, (8) amount in controversy and results, (9) experience, reputation and ability of attorney, (10) undesirability of the case in legal community, (11) nature and length of professional relationship between attorney and client, (12) awards in similar cases. Id.

(6) In the instant case, BIP agreed to pay some amount of plaintiff's attorneys' fees associated with the present litigation, but disagreed over the appropriate amount. Defendants agree that the LeClair Ryan fees during the litigation are reasonable, but disagree that the fees incurred prior to suit or after August 13, 2004, should be awarded. At a pretrial conference on August 13, 2004, the parties represented that the suit for specific performance was no longer needed as they had agreed to close on the transaction. Defendants argue that any fees incurred after August 13, 2005 are related to the details of the closing of the transaction, rather than the lawsuit as they announced their agreement to perform at that time.

(7) Close examination of the billing statements submitted by the parties reveals that the vast majority of the time entries after August 13, 2004 relate to negotiation of the terms of the tower lease or other closing items. As a result, there is substantial merit in defendants' argument

8

that the fees and costs incurred after August 13, 2004 were not "incurred in or as a result of [this] action." Matters relating to the terms of the tower lease and other closing matters were disputed issues that would have required resolution before closing regardless of the filing of any suit by either party. As such, this Court finds that fees incurred after August 13, 2004 are not recoverable under the Asset Purchase Agreement.

(8) On the other hand, there is no merit to the argument that fees and costs incurred prior to filing suit are not compensable. LeClair Ryan had no prior dealings with plaintiff, and was hired for the sole purpose of bringing this lawsuit once matters had broken down. Certainly, fees and costs incurred to prepare for and file a lawsuit may be recovered. As defendants have stipulated the reasonableness of the time spent and hourly rate reflected in the LeClair Ryan billing statements, there is no further dispute as to the charges of that law firm. Plaintiff is entitled to be reimbursed under the terms of the Asset Purchase Agreement for the full amount charged by LeClair Ryan through August 13, 2004. The total amount of the LeClair Ryan fees awarded is $17,774.52.

(9) As regards to the fees and costs charged by the Wood, Maines & Brown firm, the Court finds the fees submitted are both reasonable and within the scope of the instant litigation. However, as with those fees submitted by LeClair Ryan, fees incurred after the parties announced on August 13, 2004 that the case had been resolved and the parties were proceeding to closing are not recoverable. Therefore, fees incurred after that date will not be included. All other related fees are reasonable in both rate and time and with regards to their relationship and necessity to this litigation. The total amount of the Wood, Maines fees to be awarded is $9,921.11.

9

(10) Plaintiff also seeks fifteen hours of attorneys' fees (for both LeClair Ryan and Wood, Maines) for the trial of this case. There are several reasons why plaintiff's request for attorneys' fees for the trial of this case must be denied. First, as Mr. Wood was a witness at trial, it would not be appropriate to award legal fees associated with his appearance. Second, consideration of the issue of attorneys' fees at trial implicates both the Asset Purchase Agreement and the Escrow Agreement. In the Escrow Agreement executed at closing on April 15, 2005, the parties recognized that a dispute existed as to the amount of attorneys' fees and over the amount of the repairs for the transmitter. The point of the Escrow Agreement was that these disputes survived the closing of the Asset Purchase Agreement. Unlike the Asset Purchase Agreement, however, the Escrow Agreement contains no provision for an award of attorneys' fees incurred to resolve the surviving disputes. Had the parties intended that the prevailing party on the issues specified in the Escrow Agreement as remaining open after closing be entitled to fees associated with those disputes, the Escrow Agreement would have contained an attorneys' fee provision. As it did not, there is no contractual basis for the recovery of attorneys' fees incurred after closing and at trial. As there is no common law or contractual basis to recover attorneys' fees associated with the trial, plaintiff's request to recover its fees for trial of the two issues in the Escrow Agreement will be denied.

(11) Therefore, it is the finding of this Court that plaintiff be awarded $11,790.56, reflecting damages for the transmitter, and attorneys' fees and costs in the amount of $27,695.63. The total award for plaintiff in the instant case is $39,486.19, which is reflected in a separate Final Order and Judgment entered this day.

10

The Clerk of the Court is hereby directed to send a certified copy of these Findings of Fact and Conclusions of Law to counsel of record.

**ENTER:** This 1st day of September, 2005.

_____
Michael F. Urbanski
United States Magistrate Judge